1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

|  |  |
|---|---|
| **RUDY URENA and VICTOR URENA, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**EARTHGRAINS DISTRIBUTION, LLC, and BIMBO BAKERIES USA, INC.,**<br><br>**Defendants.** | **Case No.: SACV 16-00634-CJC(DFMx)**<br><br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

## I.  INTRODUCTION

     Plaintiffs Rudy Urena and Victor Urena, on behalf of themselves and those similarly situated, bring this employment action against Defendants Earthgrains

Distributions, LLC ("Earthgrains"), and Bimbo Bakeries USA, Inc., alleging that Defendants mischaracterize them as independent contractors rather than employees.  (*See generally* Dkt. 62.)  Before the Court is Plaintiffs' Motion for Class Certification.  (Dkt. 70-1.)  For the reasons explained below, the motion is DENIED.

## II.  BACKGROUND

Earthgrains  distributes breads and other baked goods, including those made by Defendant Bimbo Bakeries USA.  (Dkt. 62 ¶ 14; *see also* Dkt. 70-9 ¶ 7 (indicating that Bimbo Bakeries USA is Earthgrains' parent company); Dkt. 81-1 ¶ 1 (single declarant for both Defendants).)  Earthgrains enters into distribution agreements with Distributors which authorize and require Distributors to deliver baked goods to stores in a specific sales area.  (*See* Dkt. 81-1 ¶¶ 10–11; *id.* Ex. A § 2.1; Dkt. 70-9 ¶ 10.)  Distributors purchase products at "depots" and then re-sell them to customers in the service area. (Dkt. 81-1 ¶ 11; Dkt. 70-9 ¶ 11.)  Upon delivery, Distributors also rotate the stock at the stores and remove stale (seven day-old) products.  (Dkt. 70-9 ¶ 12.)  Distributors then return to the depot and unload stale products; they are charged by Earthgrains for any stale products not timely removed from stores.  (*Id.* ¶¶ 11–12.)  Distributors also upload sales data using electronics leased from Earthgrains.  (*Id.* ¶ 11.)

Earthgrains has contracted with over 250 Distributors in California since February 23, 2013.  (Dkt. 81-1 ¶ 10.)  Those Distributors have purchased products from thirteen different depots during that timeframe, three of which are unmanned.  (*Id.* ¶ 13.) Distributors are overseen by Territory Sales Managers ("TSMs"), who visit and inspect stores in a Distributor's sales area.  (Dkt. 70-9 ¶ 13.)  At ten of the depots, TSMs are also present and they interact with Distributors.  (*Id.* ¶ 14.)  There have been more than two dozen TSMs since February 2013.  (Dkt. 81-1 ¶ 13.)  In addition, meetings with

Distributors and TSMs occasionally occur at depots; at these meetings, TSMs inform Distributors about new products and review sales from the past year.  (Dkt. 81-3 ¶ 28.)

Customers within a service area are categorized as either chains (*e.g.* Walmart) or independent.  (*Id.* ¶ 20.)  Chain customers generally negotiate with and remit payment to Earthgrains rather than individual Distributors.  (*See id.* ¶ 21; Dkt. 70-9 ¶ 10 (Chains "are Earthgrains' accounts: Earthgrains negotiates . . . over the significant economic terms, including product pricing, amount of shelf space, . . . and which products will be carried.").)  Independent customers, in contrast, typically negotiate with and pay Distributors directly.  (Dkt. 81-1 ¶ 24.)  For Plaintiff-Distributor Rudy Urena, ninety to ninety-five percent of his customers are chains; all of Plaintiff-Distributor Victor Urena's customers are chains.  (Dkt. 70-9 ¶ 10; Dkt. 70-10 ¶ 10.)

Earthgrains' computer system also "suggests" daily orders for each customer within a Distributor's sales area.  (Dkt. 70-10 ¶ 15.)  While Distributors can deviate from that suggestion, Plaintiff Victor Urena's TSM recommended that he not do so.  (*Id.*)  Earthgrains can also unilaterally increase a Distributor's order.  (*Id.*)

Distributors can, without notifying Earthgrains, use workers to operate their business, instead of distributing the products themselves.  (Dkt. 81-1 ¶ 14.)  Distributors can service more than one service area, in which case they hire workers to service some or all of their service areas.  (*See, e.g.*, Dkt. 81-6 ¶¶ 4–5, 9 (three sales areas, two hired workers); Dkt. 81-7 ¶¶ 6 (two sales areas, two hired workers).)  Other Distributors work a few days a week while relying on workers to service their sales areas the rest of the time.  (*See, e.g.*, Dkt. 81-10 ¶¶ 15–16 (Distributor relies on hired workers on Sundays and Wednesdays, as well as annual vacation); Dkt. 81-14 ¶¶ 14–16 (same).)  In addition, the distribution agreements authorize Distributors to perform non-competitive work for other companies.  (Dkt. 81-1 ¶ 15.)

Plaintiffs' operative Complaint seeks to certify a class of "All persons who are or have operated as bakery goods Delivery Drivers for DEFENDANTS in the State of California under a 'Distribution Agreement' or a similar written contract that they entered into on behalf of themselves or entities in which they have an ownership interest (referred to as 'Delivery Drivers') during the period commencing February 26, 2012 through trial in this action."  (Dkt. 62 ¶ 39.)   There are three distribution agreements that were in effect for Distributors during that timeframe—a 2013 agreement, a 2014 agreement, and a 2016 agreement.  (Dkt. 81-1 ¶ 6.)  The vast majority of Distributors—225 out of 288— operate(d) under the 2013 agreement.  (Dkt. 70 Ex. 1.)

The distribution agreements last for ten years.  (Dkt. 81-1 Ex. A § 2.5, Ex. B § 3.1, Ex. C § 3.1.)  Each specifies that the Distributors are independent contractors.  (*Id.* Ex. A § 2.2, Ex. B § 2.2, Ex. C § 2.2.)  When a Distributor is in breach of the distribution agreement, Earthgrains may issue it a breach letter.  (*Id.* ¶ 27.)  Approximately 140 breach letters have been issued in the last two years, but only two distribution agreements have been terminated.  (*Id.* ¶ 28.)

Breaching the distribution agreement also authorizes Earthgrains to terminate the contract once the right to cure is exhausted.  (*Id.* Ex. A §§ 9.1, 9.3, Ex. B §§ 11.1, 11.3, Ex. C §§ 11.1, 11.3.)  The 2013 distribution agreement gives Earthgrains the right to terminate the agreement without giving a Distributor the right to cure if a breach involves, *inter alia*, criminal activity, fraud, or threatens public health.  (*Id.* Ex. A § 9.2.) In contrast, the 2014 and 2016 agreements give Earthgrains the right to terminate the agreement on the basis of good cause, defined to include failure to timely cure a breach, chronic breaches, or dishonesty.  (*Id.* Ex. B § 11.2, Ex. C § 11.2.)  The 2013 agreement also gives Earthgrains the right to buy back all or a portion of a Distributor's distribution rights for a set price at any time after one year into the performance period.  (*Id.* Ex. A § 7.3.)  The 2014 and 2016 agreements specify a set price for such a transaction, but state

that such a transaction can only occur with the consent of the Distributor.  (*Id.* Ex. B §
9.8, Ex. C § 9.8.)

## III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 23, district courts have broad discretion to
determine whether a class should be certified.  *Armstrong v. Davis*, 275 F.3d 849, 871
n.28 (9th Cir. 2001).  As a threshold matter, "plaintiffs must first define an ascertainable
and identifiable class."  *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives &
Composites, Inc.*, 209 F.R.D. 159, 163 (C.D. Cal. 2002); *Schwartz v. Upper Deck Co.*,
183 F.R.D. 672, 679–80 (S.D. Cal. 1999) ("Although there is no explicit requirement
concerning the class definition in FRCP 23, courts have held that the class must be
adequately defined and clearly ascertainable before a class action may proceed."); *but see
Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017) (declining to
impose separate administrative feasibility requirement for class certification).

The party seeking class certification also bears the burden of showing that each of
the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are
met.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  Rule 23
is not merely a pleading standard—a party seeking class certification must affirmatively
demonstrate compliance with the Rule by proving the requirements in fact.  *Wal-Mart
Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Rule 23(a) provides that a case is
appropriate for certification as a class action if: "(1) the class is so numerous that joinder
of all members is impracticable; (2) there are questions of law or fact common to the
class; (3) the claims or defenses of the representative parties are typical of the claims or
defenses of the class; and (4) the representative parties will fairly and adequately protect
the interests of the class."  These four requirements are often referred to as numerosity,

commonality, typicality, and adequacy. *See General Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982).

Rule 23(b) defines different types of classes. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2012). In this case, Plaintiffs seek certification pursuant to Rule Rule 23(b)(3). (Dkt. 62 ¶ 39.) Rule 23(b)(3) allows certification where "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)–(D).

## IV. DISCUSSION

Plaintiffs' motion for class certification seeks to certify the following class:

> All persons who have, during the period commencing February 23, 2013 through trial in this action, served as "Distributors" by personally delivering and/or merchandising products in the State of California under a "Distribution Agreement" with Earthgrains Distribution, LLC that they entered into on behalf of themselves or entities in which they have an ownership interest.

(Dkt. 70-1 at 3.[1])  This class does not meet the requirements of Rule 23(b)(3)—class-wide issues do not predominate over individual issues nor is a class action a superior vehicle for resolving Plaintiffs' claims.[2]

## A. Predominance

Rule 23(b)(3) requires that "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members.  This "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Predominance is a similar inquiry to commonality, but requires a heightened showing that facts and issues common to the class predominate over any individual issues that might be present.  *See* Fed. R. Civ. P. 23(b)(3); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).  The main concern is the "balance between individual and common issues." *Mevorah v. Wells Fargo Home Mortg. (In re Wells Fargo Home Mortg. Overtime Pay Litig.)*, 571 F.3d 953, 959 (9th Cir. 2009).  However, Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.'" *Id.* at 1196 (modifications in original).  It also does not require a showing that "questions common to the class . . . will be answered, on the merits, in favor of the class." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013).

---

[1] The Court notes that this class definition is materially different from the definition in the operative Complaint.  (*Compare id. with* Dkt. 62 ¶ 39 ("All persons who are or have operated as bakery goods Delivery Drivers for DEFENDANTS in the State of California under a "Distribution Agreement" or a similar written contract that they entered into on behalf of themselves or entities in which they have an ownership interest (referred to as 'Delivery Drivers') during the period commencing February 26, 2012 through trial in this action.").)  No explanation is given for the discrepancy.  Accordingly, Plaintiffs' motion is procedurally improper—if Plaintiffs wished to change the definition of the proposed class that they would seek certification for, they should have sought leave from this Court to file another amended complaint that contained a precise definition for their new proposed class.

[2] Since Rule 23(b)(3)'s requirements are not met, it is unnecessary to consider Rule 23(a)'s requirements.

The predominance inquiry begins with the elements of the underlying causes of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). All of Plaintiffs' causes of action are predicated on the claim that Distributors such as themselves are miscategorized by Defendants as independent contractors when, in actuality, they are Defendants' employees. (*See generally* Dkt. 62.)

In determining a worker's legal classification as either "employee" or "independent contractor," the principal test in California is "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 988 (9th Cir. 2014) (citation omitted).

While the right-to-control test is the touchstone of worker classification, California law also considers several secondary factors, often termed the *Borello* factors after the eponymous case in which the factors were first articulated:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 351 (1989). "The individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." *Id.* at 404 (citation omitted).

### 1. Right to Control

Facts and issues common to the proposed class do not predominate over issues specific to each Distributor regarding Defendants' right to control Distributors.  "[W]hat matters . . . is not how much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise."  *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 533 (2014) (emphasis in original).  The critical question is whether Defendants retained "all necessary control" over the Distributors' operations.  *Id.* at 513.  "The fact that a certain amount of freedom of action is inherent in the nature of the work does not change the character of the employment where the employer has general supervision and control over it."  *Id.* at 531 (citations and quotations omitted).

Where, as here, the extent of the right of control is determined by contract, any applicable contracts are the "necessary starting point" for the analysis.  *Id.* at 535.  "[W]ithout a full examination of the contract[s]," determining predominance for right of control is "virtually impossible."  *Id.* at 535.

"Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because the power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities."  *Id.* at 531 (quotation omitted); *see also Borello*, 48 Cal. 3d at 350 ("[S]trong evidence in support of an employment relationship is the right to discharge at will, without cause.") (quotation omitted).  The contractual evidence on termination here varies because there are significant differences between the termination provisions in the applicable distribution agreements.  The 2013 distribution agreement allows termination without right to cure for breaches by Distributors that involve "criminal activity, fraud, threa[ts to] public health or safety, constitute[] an abandonment of any portion of the Sales Area, or threatens to do significant harm" to Defendants and their brand, (Dkt. 81-1 Ex. A § 9.2).  In contrast, the

2014 and 2016 agreements state that non-curable breach occurs if there is good cause, which is defined as *including, but not being limited to* failure to timely cure any breach; chronic breaches; Distributor actions or failures to act in any manner that threatens public health or safety or to do significant harm to Defendants; any act of dishonesty, violence, or threat of violence, or unlawful or criminal activity; and material misrepresentation by a Distributor to induce Defendants to enter into the distribution agreement.  (Dkt. 81-1 Ex. B § 11.2, Ex. C § 11.2.)

Additionally, the 2013 distribution agreement gives Defendants the unilateral right to purchase part or all of a Distributor's distribution rights at any time one year after the agreement's consummation for a pre-set price.  (Dkt. 81-1 Ex. A § 7.3.)  The buyout provision in the 2014 and 2016 agreements is substantially different—rather than being a unilateral right held by Defendants and in existence one year after the contract is consummated, buyout requires a Distributor's consent and can occur at any time.  (Dkt. 81-1 Ex. B § 9.8, Ex. C § 9.8.)

The narrower, delineated grounds for termination in the 2013 agreement indicates that Distributors under that agreement have significantly more autonomy than Distributors under the 2014 and 2016 agreements, who are subject to broader, open-ended grounds for termination.  That divergence is slightly tempered by Defendants' unilateral right to buy back the distribution rights held by 2013-agreement Distributors, in contrast with the more limited buyback authority Defendants have under the 2014 and 2016 agreements.  Nevertheless, the termination provisions are sufficiently different to preclude class-wide common proof.   It is also notable that neither standard gives Defendants *carte blanche* authority to terminate Distributors without cause, which is consistent with an independent contractor relationship.

//

In addition to divergent termination provisions, three other differences between the distribution agreements preclude a finding that the common question of right of control predominates over individualized issues.  First, the 2013 agreement requires Distributors to conduct their business "in accordance . . . with all instructions, rules, and procedures which may be prescribed by [Defendants]" including compliance with Defendants' Operational Guidelines Manual.  (Dkt. 81-1 Ex. A §§ 2.1, 5.3.)  The only remotely comparable provision in the 2014 and 2016 agreements is that Defendants "may from time to time implement and/or amend programs regarding Product deliveries and/or Product accountability, including depot hours of operation and check in procedures.  Distributor agrees to reasonably cooperate and comply with such programs."  (*Id.* Ex. B § 4.4, Ex. C § 4.4.)  That difference is highly significant to evaluating Defendants' right of control—Distributors under the 2014 and 2016 agreements at least arguably have far more autonomy and decision-making authority than those under the 2013 agreement.

Second, the 2013 agreement gives Defendants the right to "monitor" Distributors' performance *and* the satisfaction of customers serviced by Distributors, while the 2014 and 2016 agreements only state that Defendants have the right to "review" Distributors' performance of the agreement.  (*Compare id.* Ex. A § 5.1 with *id.* Ex. B § 6.1, Ex. C § 6.1.)  Once again, Distributors under the 2014 and 2016 agreements have greater autonomy insofar as Defendants' oversight is more restricted than it is over Distributors operating under the 2013 agreement.

Third, the 2013 agreement explicitly states that, in negotiating pricing and other details with chains, Defendants are acting in their own interest and "not acting as the agent or joint venturer" of Distributors.  (*Id.* Ex. A § 5.2.)  In contrast, the 2014 and 2016 agreements characterize Defendants' negotiations with chains as occurring at least in part at the request of Distributors and state that, in such negotiations, Defendants are appointed by Distributors to act as their non-exclusive representative.  (*Id.* Ex. B. § 8.2,

Ex. C § 8.2.)  This distinction is also significant to the right-to-control analysis because Defendants acting as Distributors' representatives limits Distributors' autonomy vis-à-vis chains, who are often the most significant customers in a Distributor's sales area.

Because of these significant contractual differences among Distributors in the class, the critical factor of whether Defendants retain all necessary control is not a common question that predominates over individual issues.  Rather, determining whether this *most significant* factor supports an employment relationship would require extensive, Distributor-specific proof and a series of mini-trials.

### 2. *Secondary* Borello *Factors*

As with Defendants' right to control the Distributors, facts and issues regarding six of the eight secondary *Borello* factors are in whole or in part not subject to common proof.  Rather, analysis of the secondary *Borello* factors will need to be litigated on an individual basis.

The first secondary *Borello* factor, whether or not the Distributors perform a distinct occupation or business, is not amenable to common proof.  "If a worker is engaged in a distinct occupation or business, then that would suggest that the worker is an independent contractor rather than an employee."  *Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128, 1138–39 (N.D. Cal. 2009).  However, "[a] finding of employment is supported where the workers are 'a regular and integrated portion of [the] business operation.'"  *Garcia v. Seacon Logix, Inc.*, 238 Cal. App. 4th 1476, 1487 (2015) (quoting *Borello*, 48 Cal. 3d at 357).

Notably, the 2014 and 2016 agreements state that the Distributors are in a separate occupation from Defendants, but that concession is absent from the 2013 agreement.

(*Compare* Dkt. 81-1 Ex. A *with id.* Ex. B at 1 *and id.* Ex. C at 1.)  The extent to which Distributors hold themselves out as a business separate from Defendants' business also in large part depends on the number of sales areas a Distributor services and the extent to which they rely on hired workers versus servicing the service areas personally.  (*See, e.g.*, Dkt. 81-6 ¶¶ 4–5, 9 (three sales areas, two hired workers); Dkt. 81-7 ¶¶ 6 (two sales areas, two hired workers); Dkt. 81-10 ¶¶ 15–16 (Distributor relies on hired workers on Sundays and Wednesdays, as well as annual vacation); Dkt. 81-14 ¶¶ 14–16 (same); Dkt. 81-11 ¶¶ 5–6 (Distributor personally delivers products approximately five weeks per year).)  Another relevant difference between Distributors is the extent to which they make deliveries for companies other than Defendants, if they do so at all.  (*E.g.*, Dkt. 81-12 ¶ 29 (Distributor also runs cookie distribution).)  Overseeing a fleet of delivery trucks and supervising numerous workers who deliver various products to various customers is comparatively more distinct from Defendants than a solo Distributor who personally services one service area with exclusively Defendants' products.  *See Antelope Valley Press v. Poizner*, 162 Cal. App. 4th 839, 854 (2008), as modified on denial of reh'g (May 30, 2008); *Garcia*, 238 Cal. App. 4th at 1487.

The second secondary *Borello* factor, the extent of Defendants' supervision over Distributors, must be litigated on an individual basis.  "If the type of work performed is usually done under an employer's direction, it suggests an employer-employee relationship; if the work is usually done by a specialist without supervision, it suggests an independent contractor relationship. . . . [W]here a plaintiff can determine her own day-to-day hours, including her vacations and on most days, fix the time for her arrival and departure at her office and elsewhere, including lunch and breaks, that suggests an independent-contractor status."  *Hennighan v. Insphere Ins. Sols., Inc.*, 38 F. Supp. 3d 1083, 1103 (N.D. Cal. 2014), aff'd, 650 F. App'x 500 (9th Cir. 2016) (quotations and citations omitted).  As supervision is "largely duplicative of the control factor," *Harris*, 656 F. Supp. 2d at 1139, the differences between distribution agreements identified above

will apply to analysis of this factor as well.  As with the distinct business factor discussed above, Defendants' supervision of Distributors also depends on whether a Distributor relies on hired workers and the extent to which Distributors personally deliver Defendants' product to customers, since Defendants do not interact with hired workers but they do interact with Distributors.  (*See, e.g.*, Dkt. 81-10 ¶ 16; Dkt. 81-11 ¶¶ 5–6.) And supervision also varies by Distributor depending on, *inter alia*, (1) whether the depot from which a Distributor purchases products is staffed by TSMs representing Defendants or is unstaffed, (Dkt. 81-1 ¶ 13), and (2) the proportion of chain stores within a given Distributor's sales area, since Defendants negotiate the terms of servicing chains and the distribution agreement mandates that Distributors service chain customers in their sales area if the chains are profitable to Defendants on the whole, regardless of whether a particular chain in a particular area is profitable to a particular Distributor, (*id.* Ex. A §§ 4.2, 5.2; *id.* Ex. B §§ 6.3, 8.2; *id.* Ex. C §§ 6.3, 8.2).

The third secondary *Borello* factor, the skill required to be a Distributor, is also individualized.  "Where no special skill is required of a worker, that fact supports a conclusion that the worker is an employee instead of an independent contractor."  *Harris*, 656 F.Supp.2d at 1139.  Distributors whose sales area is primarily or entirely chains, like the Plaintiff, (Dkt. 70-9 ¶ 10 (ninety to ninety-five percent chains); Dkt. 70-10 ¶ 10 (one hundred percent chains)), do not have to engage in as much entrepreneurship as Distributors who service a large number of independent customers.  When servicing chains, a Distributor's marginal talents and his or her particular relationships with and satisfaction of managers of particular stores are also comparatively more attenuated from that Distributor's compensation and success.  Distributors who service more than one service area or who rely occasionally, partially, or entirely on hired help to make deliveries also require greater skill at management and efficiency to succeed.

//

The fourth secondary *Borello* factor, whether or not Distributors furnish the instrumentalities and tools for their work, also can not be demonstrated with common proof.  "Where the defendant did not furnish the majority of the tools and instrumentalities nor a place to work, this fact weighs in favor of finding an independent-contractor relationship.  Where a plaintiff used his own car, purchased its gas . . . and liability insurance, and received no standard employee benefits, he is likely an independent contractor." *Hennighan*, 38 F. Supp. 3d at 1103–04 (citations and quotations omitted).  Here, some Distributors choose to lease their vehicles from Defendants while others use or purchase their own vehicles.  (*Compare* Dkt. 81-8 ¶ 3 *and* Dkt. 81-9 ¶ 6 *with* Dkt. 81-5 ¶¶ 3–4.)

The fifth secondary *Borello* factor, the length of the relationship between Distributors and Defendants, differs between distribution agreements and therefore also is not uniform class-wide.  "Where a worker is employed for a lengthy period of time, the relationship with the employer looks more like an employer-employee relationship." *Harris*, 656 F. Supp. 2d at 1140; *see also Narayan v. EGL, Inc.*, 616 F.3d 895, 902–03 (9th Cir. 2010) ("Significantly, the contracts signed by the plaintiff Drivers contained automatic renewal clauses and could be terminated by either party upon thirty-days notice or upon breach of the agreement.  Such an agreement is a substantial indicator of an at-will employment relationship.").  "[T]he notion that an independent contractor is someone hired to achieve a specific result that is attainable within a finite period of time, such as plumbing work, tax service, or the creation of a work of art for a building's lobby, is at odds with [individuals] who are engaged in prolonged service [for a particular company]." *Antelope Valley*, 162 Cal. App. 4th at 855.

All three distribution agreements have a ten year term.  (Dkt. 81-1 Ex. A § 2.5, Ex. B § 3.1, Ex. C § 3.1.)  However, the 2013 distribution agreement specifies that Distributors have the *option* to seek reappointment as Distributors following the

expiration of the agreement according to the terms of the then-current distribution agreement and provided that, *inter alia*, the Distributor is in compliance with the agreement and has not received three or more breach letters within any twelve-month period. (*Id.* Ex. A §§ 2.6–2.7). In contrast, the 2014 and 2016 agreements *automatically renew* at the end of the ten year term, unless good cause exists for terminating the agreement or Distributors notify Defendants of their desire to renew, Defendants provide Distributors with a new distribution agreement, and Distributors sign it. (*Id.* Ex. B § 3.2, Ex. C § 3.2.)

The sixth secondary *Borello* factor, the method of payment, is amenable to class-wide proof. "Where the worker is paid by the hour, it typically suggests an employment relationship; where the worker is paid by the job, it points toward independent contractor." *Hennighan*, 38 F. Supp. 3d at 1104 (quotation omitted); *see also Antelope Valley Press*, 162 Cal. App. 4th at 855 (method of payment supported presence of an employment relationship when "remuneration [was] in very large part dependent on nonnegotiated financial terms in the contract rather than on the [worker's] initiative, judgment or managerial abilities"). Distributors are uniformly paid by the quantity of product that they sell to customers, not by the length of time it takes them to service those customers. (*See, e.g.*, Dkt. 70-8.) And that, in turn, depends on each Distributor's entrepreneurship. (*See, e.g.*, Dkt. 81-3 ¶ 8 ("I was able to increase my sales so significantly by going out and getting sales, merchandizing, and building relationships with my customers' store managers.").)

The seventh secondary *Borello* factor, whether the work is an integral part of the principal's regular business, is uniform across the proposed class. "[P]ermanent integration of [workers] into the heart of [the principal's] business is a strong indicator that [the principal] functions as an employer." *Borello*, 48 Cal. 3d at 357; *see also Alexander*, 765 F.3d at 996 (workers providing services "essential" to a principal's "core

business" support an employment relationship).  Distributors' role and significance in Defendants' business is uniform across Distributors since it turns on how integral the servicing of customers and delivery of Defendants' products are to Defendants.

The eighth secondary *Borello* factor, the parties' belief as to their relationship status, is by definition individualized.  "What is important under this *Borello* factor is not the particular legal label attached (expressly or implicitly) by the parties to the relationship, rather, it is their understanding as to the nature of that relationship as a matter of fact."  *O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2015 WL 5138097, at *27 (N.D. Cal. Sept. 1, 2015); *see also Hennighan*, 38 F. Supp. 3d at 1104 ("Mere labels set out in an agreement do not establish the existence or non-existence of an employer-employee relationship.").  While all Distributors operate under distribution agreements attesting to their being independent contractors, (Dkt. 81-1 Ex. A § 2.2, Ex. B § 2.2, Ex. C § 2.2), the disagreement between Plaintiffs and other Distributors regarding the nature of their relationship with Defendants demonstrates that complete analysis of this factor will require Distributor-specific evidence, (*compare* Dkt. 70-9 ¶ 5 *and* Dkt. 70-10 ¶ 5 *with, e.g.*, Dkt. 81-10 ¶¶ 20–21 ("I am running a business and I like being independent.  I understand that the plaintiffs in this lawsuit believe that they were Earthgrains employees.  That is laughable to me.").

Finally, on top of individualized evidence being necessary to analyze the secondary *Borello* factors, the same Distributor-specific variables will mandate individualized analysis of the factors as a whole.  "The individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations."  *Borello*, 48 Cal. 3d at 404.  Particular combinations of distributor agreement, type of depot, proportion of chains, number of sales areas, ownership of vehicles, and the use of employees will lead to different secondary factors weighing more or less when they are analyzed as a whole.

Simply stated, facts and issues common to the class regarding Distributors' classification as independent contractors do not predominate over the myriad of individual issues that are present.[3]

### 2. Superiority

"The purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting 7AA Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 1779 at 174 (3d ed. 2005)). The superiority inquiry "requires the court to determine whether maintenance of this litigation as a class action is efficient and whether it is fair." *Id.* at 1175–76; *see also* Fed. R. Civ. P. 23(b)(3)(D) (stating that "the likely difficulties in managing a class action" is pertinent to the superiority inquiry). The inquiry "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution," *Hanlon*, 150 F.3d at 1023, and focuses "on the efficiency and economy elements of the class action," *Zinser*, 253 F.3d at 1190; *see also Briseno*, 844 F.3d at 1128. "Superiority must be looked at from the point of view (1) of the judicial system, (2) of the potential class members, (3) of the present plaintiff, (4) of the attorneys for the litigants, (5) of the public at large and (6) of the defendant. The listing is not necessarily in order of importance of the respective interests. Superiority must also be looked at from the point of view of the

---

[3] As Distributors' purported miscategorization is a predicate of Plaintiffs' other claims, it is unnecessary to determine whether issues common to the class will predominate over individual issues in analysis of those claims. The Court notes, however, that Defendants have identified various defenses to those claims that would need to be analyzed for each Distributor. (*See* Dkt. 80 at 26–29). For example, a Distributor who supervises workers and delivers in numerous service areas may not be able to recover for a meal or rest break claim under the administrative or executive exemptions to California's employment laws. *See* Cal. Wage Order 1-2001 §§ 1(A)(1),(2). Another defense that Defendants could raise that could not be analyzed class-wide arises from the fact that the 2013 distribution agreement includes voluntary mediation before litigation whereas the 2014 and 2016 distribution agreements mandate binding arbitration and include an express class action waiver. (*Compare* Dkt. 81-1 Ex. A Art. 12 *with id.* Ex. B Art. 13 *and id.* Ex. C Art. 13.)

issues." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 713 (9th Cir. 2010) (quoting *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 212 (9th Cir. 1975)); *see also* Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment, 39 F.R.D. 69, 102–03 (1966) ("Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.").

The Court is convinced that managing this case as a class action would likely be quite difficult and consume extensive judicial resources. The proposed class definition will require detailed, individualized inquiries to determine whether a particular Distributor is a class member. For example, Plaintiffs provide no guidance whether a Distributor who services two sales areas, one personally and one through hired help, with the use of one vehicle financed by Defendants and the other personally owned, would be in the class. And once the class members are identified, the Court will have to make entirely separate inquiries as to miscategorization based on the different distribution agreements. On top of that, the Court's analysis will be further severely fractured based on the myriad of individualized facts and factors relevant to employee status, such as the chain/individual customer ratio in each sales area and whether a Distributor purchases Defendants' products at TSM-staffed depots, unstaffed depots, or some combination thereof.

Heavy administrative burdens, in a vacuum, do not justify a finding that superiority is not met. Rather, the Court must also consider whether there are realistic alternatives to class treatment. *See Briseno*, 844 F.3d at 1128; *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th Cir. 1996). A predicate to considering such alternatives is determining whether there is a critical mass of aggrieved parties whose rights could be efficiently vindicated through class action litigation. Plaintiffs have wholly failed to

present sufficient argument and evidence to allow the Court to conclude that such a critical mass exists.  In addition to their own declarations, which attest to their belief that they were Defendants' employees, (Dkt. 70-9 ¶ 5; Dkt. 70-10 ¶ 5), they offer two declarations from current Distributors and three from former distributors, (Dkts. 70-11, 70-12, 70-13, 70-14, 70-15).  While those five declarations attest to facts consistent with Plaintiffs' argument that Distributors are employees, none of them explicitly states that the declarant believed he or she was Defendants' employee.  (*See id.*)  Instead, one of them conceded in his deposition that he was an independent contractor, (*see* Dkt. 81-17 at 9), another admitted that he had not read the entire declaration and that he knowingly and comfortably signed his distribution agreement with Defendants including a provision stating that he was an independent contractor, (*see* Dkt. 81-22 at 36, 47), and two more previously signed declarations submitted by Defendants' predecessor in equivalent litigation and in which they attested to being independent contractors, (*see* Dkt. 81-29 ¶ 11; Dkt. 84-7 at 110–11; *but see* Dkt. 84-8 at 15 (declarant's deposition testimony potentially indicating that declaration was signed under duress); Dkt. 84-7 at 111 (declarant's deposition testimony that his belief at that time was incorrect in hindsight)).

Defendants, on the other hand, submitted twelve declarations from current Distributors who all, and many vehemently, attest to understanding and believing that they are independent contractors.  (*See* Dkt. 81-3 ¶¶ 1, 16 ("I am an Independent Operator, which means I own a business engaged in buying and selling products of Earthgrains. . . . I run my route myself."); Dkt. 81-4 ¶¶ 1, 9, 19, 25 ("When I signed a distribution agreement, I knew what I was getting into—I knew that I was an independent contractor and not an employee. . . . Earthgrains had no say in how my business hired, disciplined, or fired its employees, and has no say in how my business pays them—they can't, because I am independent . . . . I like having the flexibility of being self-employed. . . . I understand that the plaintiffs in this lawsuit claim that they should have been classified as employees of Earthgrains.  That is not my view—we all know what we are

getting into when we buy distributorships. . . . I like running my own business, and I would not want to be an employee."); Dkt. 81-5 ¶¶ 1, 26 ("When I signed a distribution agreement, I knew that I was an independent contractor and not an employee. . . . I honestly don't know why these guys are filing a lawsuit.  I love running my own business.  I am my own boss."); Dkt. 81-6 ¶¶ 1, 30 ("And no Earthgrains representative has ever tried to discipline me or even threatened to do so—they know they can't because I am independent."); Dkt. 81-7 ¶ 21 ("I am happy to be independent; I am not good when I have a boss telling me how to work.  I like to set my own schedule and and take breaks whenever I want to stop and get coffee, eat lunch, etc.  No one controls me.  The plaintiffs who want to be employees do not represent my views." ); Dkt. 81-8 ¶ 25 ("I am really glad that I made the switch from being an employee to an [independent operator].  Buying a route is like buying a house, it builds equity."); Dkt. 81-9 ¶ 20 ("I take responsibility for and pride in operating my business. . . . I am an independent business owner and am treated as such by Earthgrains."); Dkt. 81-10 ¶¶ 1, 20–21 ("[E]veryone who signs up knows that they are not employees. . . . I like what I do. . . . I like being self-employed. . . . I am running a business and I like being independent.  I understand that the plaintiffs in this lawsuit believe they were Earthgrains employees.  That is laughable to me.  Anyone who says they did not know that they would [be] independent when they bought a distributorship from Earthgrains is lying—we all knew what we were getting into.  Anyone who says that does not represent me and my views on my business"); Dkt. 81-11 ¶ 23 ("Part of being self-employed is knowing what pace you want to work at, and [independent operators] can control that by hiring employees or selling off a piece of their business."); Dkt. 81-12 ¶¶ 13, 30 ("It is a challenge.  I can see how other [independent operators] have failed with that sales area, but my business has done fairly well with it.  You have to think a lot about how to properly manage your business. . . . The [independent operators] who filed this lawsuit do not represent my views."); Dkt. 81-13 ¶ 22 ("I like the flexibility of running my own business.  The time goes by fast during the day and I make good money.  I also get to create relationships

with people, which I like doing.  And other than meeting the windows requested by the grocery stores, I have a flexible schedule."); Dkt. 81-14 ¶¶ 16, 20 ("I don't like that my business can get a breach letter from something that an employee did, but I understand why because I am an independent contractor and he is my business's employee. . . . I like working at my own pace and not having a boss over my shoulder telling me what to do, making sure I am working all the time, etc. . . . I also like the money—I make more running my business than a lot of employees make doing the same kind of work. . . . I am happy being an [independent operator]; I would not want to be an employee and the plaintiffs do not represent my interests.").)

The superiority inquiry is not a simple matter of which side produces more declarations.  However, the quantity and vehemence of declarations produced by Defendants, in contrast with the paucity produced by the Plaintiffs despite extensive efforts, (*see* Dkt. 81-20 at 111–13 (Plaintiff Rudy Urena sent many emails and text messages to other Distributors about participating in the lawsuit, as well as putting up flyers and holding three meetings)), supports the Court's conclusion that a class action is not a superior method for adjudicating Plaintiffs' claims.  More than half of the declarations submitted by Defendants indicate affirmatively that Distributors have an interest in controlling individually whether or not they seek judicial evaluation of their categorization as independent contractors.  (*See, e.g.*, Dkt. 81-4 ¶ 25 ("I like running my own business, and I would not want to be an employee."); Dkt. 81-5 ¶ 28 ("The plaintiffs who want to be employees do not represent my views."); Dkt. 81-6 ¶ 33 ("If they wanted to be employees, they should have gone elsewhere.  I operate a successful business, and the [independent operators] who filed this lawsuit do not represent my views or my interests."); Dkt. 81-7 ¶ 21 ("The plaintiffs who want to be employees do not represent my views.  I worry that the lawsuit might affect the value of my business, which I have worked hard to build."); Dkt. 81-9 ¶ 20 ("I worry about things that might affect the value of my route, like this lawsuit.  The [independent operators] who filed this lawsuit do not

represent my viewpoints or interests.  I am an independent business owner and am treated as such by Earthgrains"); Dkt. 81-12 ¶ 30 ("I received a call from the Plaintiffs' attorney in this lawsuit, but I don't want to be involved in their lawsuit and told the attorneys so. The [independent operators] who filed this lawsuit do not represent my views or my interests."); Dkt. 81-13 ¶ 20 ("I am happy being an [independent operator]; I would not want to be an employee and the plaintiffs do not represent my interests.").)  While those Distributors' interests could be vindicated through opting out post-certification, the Court frankly believes that it would be undesirable to certify a class purportedly to resolve all Distributors' legal claims only to likely face the need to decertify the class due to opt outs.

The Court does not doubt the sincerity of Plaintiffs' belief that Defendants illegally miscategorized them as independent contractors and, as such, they are owed substantial damages.  The Court also does not cast any aspersions on the seriousness of Plaintiffs' allegations, given the important role employment law serves to protect employees. However, the Court cannot conclude that, based on the evidence before it, a class action is a *superior* method of adjudicating their claims instead of allowing Plaintiffs to vindicate *their* claims through individual litigation, joined by any Distributors who sincerely agree with them.

//
//
//
//
//
//
//
//

1

## V.  CONCLUSION

2

3      For the foregoing reasons, Plaintiff's motion for class certification is DENIED.[4]

4

5

6      DATED:      July 19, 2017

7                                                    _____

8                                                          CORMAC J. CARNEY

9                                                    UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    [4] Defendants have filed an *ex parte* application to file a sur-reply brief, (Dkt. 86), which Plaintiffs
       oppose, (Dkt. 87).  The application is DENIED.  Defendants, without seeking leave of the Court or
26    providing an explanation, fuled an opposition brief to Plaintiff's motion that was twenty percent longer
       than the number of pages allowed by the local rules.  (*See* Dkt. 80; L.R. 11-6.)  The Court does not see
27    any good cause to justify allowing Defendants an additional ten pages of briefing, (*see* Dkt. 86 Ex. A
       (proposed sur-reply)), and reminds Defendants that their compliance with the Local Rules is not
28    discretionary but is mandatory.